IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| STEPHEN MILHOUSE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 16 C 11709 |
| | ) | |
| NORTHEAST ILLINOIS REGIONAL | ) | Judge John Z. Lee |
| COMMUTER RAILROAD CORPORATION | ) | |
| d/b/a METRA, METRA POLICE OFFICERS | ) | |
| ISAAC ASH AND LYNDELL LUSTER, | ) | |
| GEORGE WARD, KATINA COOK, and | ) | |
| PREMIER SECURITY CORPORATION, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Stephen Milhouse has sued the Northeast Illinois Regional Commuter Railroad Corporation ("Metra") and Metra Police Officers Isaac Ash and Lyndell Luster pursuant to 42 U.S.C. § 1983. Milhouse alleges that they violated his right to be free from unreasonable seizure under the Fourth Amendment and his right to equal protection under the Fourteenth Amendment to the United States Constitution.[1] Additionally, Millhouse claims malicious prosecution and indemnification under Illinois law. Defendants have moved for summary judgment. For the following reasons, the motion is granted as to Milhouse's equal protection claim (Count IV) and denied in all other respects.

---

[1] Milhouse has settled his claims against Defendants George Ward, Katina Cook, and Premier Security Corporation. *See* Stipulation, ECF No. 140. In addition, Milhouse has withdrawn his federal conspiracy claim (Count III) against Defendants Metra, Ash, and Luster. *See* Pl.'s Resp. Opp'n Mot. Summ. J. at 10, ECF No. 136.

## Factual Background[2]

While waiting for a train, Milhouse, who is African-American, was seated at a table in a food court at Ogilvie Transportation Center on Sunday, April 24, 2016, at approximately 7:00 a.m. Defs.' LR 56.1(a)(3) Stmt. ¶ 13, ECF No. 129; Pl.'s Ex. 1, Pl.'s Dep. ("Pl.'s Dep.") at 27, ECF No. 135-1. Milhouse plugged his laptop and cell phone into an electrical outlet located near the table. Defs.' LR 56.1(a)(3) Stmt. ¶ 14; Pl.'s Dep. at 50.

At that point, two building security guards, Ward and Cook, who are both African-American, approached Milhouse and told him to unplug his devices from the outlet. Defs.' LR 56.1(a)(3) Stmt. ¶ 15; Pl.'s Ex. 3, Cook Dep. at 81, ECF No. 135-3. The guards informed Milhouse of a building policy that prohibited the use of electrical outlets by anyone other than maintenance personnel. Defs.' LR 56.1(a)(3) Stmt. ¶ 16. Milhouse refused to unplug his devices, stating that there were no signs indicating the building's policy. *Id.* ¶ 17. According to Milhouse, he also informed Ward that other people in the food court had their devices plugged into outlets. Pl.'s LR 56.1(b)(3)(B) Stmt. ¶ 17, ECF No. 134.

The parties offer drastically different accounts as to what transpired next. According to Milhouse, neither guard ever asked him to leave the building. *See* Cook Dep. at 82–83; Pl.'s Dep. at 96. He remained seated at the table and never raised his voice, elevated his arms, or gestured with his hands. *See* Pl.'s Dep. at 85. Rather, it was Ward who raised his voice, threatening to unplug Milhouse's devices himself. *Id.* at 92–93; Defs.' LR 56.1(a)(3) Stmt. ¶ 20; Pl.'s Ex. 2, Ward Dep. at 31–32, ECF No. 135-3. After Milhouse responded that he didn't "think it would be a good idea," the guards hastily left the area. *See* Pl.'s Dep. at 83–84.

---

[2] The following facts are undisputed except where otherwise noted.

Approximately five to ten minutes later, two Metra police officers, Ash and Luster, who also are African-American, appeared in the food court. *See* Ward Dep. at 33. According to Ward and Cook, neither had spoken to the officers to request their assistance. *See* Cook Dep. at 21, 31, 34, 37, 52; Ward Dep. at 55–56, 66. Nor did they communicate with Ash and Luster after the officers encountered Milhouse. *See* Cook Dep. at 12, 40, 63; Ward Dep. at 66.

Ash and Luster approached Milhouse, who was speaking to a Caucasian woman, *see* Defs.' Ex. I, Luster Dep. at 34, ECF No. 129-9, and informed him that building policies prohibited the use of electrical outlets and directed him to unplug his laptop and cell phone. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 25; Pl.'s Dep. at 99–100. According to Milhouse, he responded to the officer's directive in a calm and collected manner by stating that he was waiting for his train. Pl.'s Dep. at 109. As Milhouse was showing the officers his train ticket, Ash handcuffed him and threatened to tase him if he did not comply with the handcuffing. *Id.* at 99–100, 108–11. According to Milhouse, these events took place only seconds after the officer approached him, and he was never given an opportunity to gather his belongings. *Id.;* Pl.'s Dep. at 102.

Luster and Ash's account of the events differs substantially from Milhouse's. As they recall, Ward approached Luster and Ash and informed them that Milhouse was causing a commotion by refusing to leave when requested, hurling profanities at Ward, and threatening him. Luster Dep. at 33, 36. In fact, Luster recounts, Ash asked Ward whether Milhouse had left the building, and Ward replied that Milhouse was still there. *Id.* at 33. Luster believed that he could have placed Milhouse in custody on that information alone. Luster Dep. at 35. (Interestingly, Ward denies that he spoke to the officers at all. Ward Dep. at 18–19, 38, 55–56, 65–68.)

As the officers tell it, after speaking with Ward, they walked over to the food court. *Id.* at 33. Ash and Luster approached Milhouse and asked him to unplug his devices, but he refused. *Id.*

3

at 35; Defs.' LR 56.1(a)(3) Stmt. ¶ 25. Luster told Milhouse he could plug his devices into the charging stations in the waiting area near the train platform; Milhouse retorted that he could plug them in anywhere he wanted. Luster Dep. at 39.

According to the officers, because Milhouse was acting in an irate and belligerent manner, Luster asked Milhouse to calm down. *Id.* at 35. And Ash began packing up Milhouse's belongings. When Milhouse protested, Ash said that they were just trying to get him moving because he was not moving. *Id.* at 39–40. Ash then told Milhouse to leave or else he would go to jail, but Milhouse did not budge and refused to leave. *Id.* at 40–41.

At this point, Officer Luster took control of one of Milhouse's arms and placed a handcuff on his right wrist. *Id.* at 42. Luster states that, because Milhouse started to tense up before his other wrist could be handcuffed, Ash instructed Luster to tase Milhouse. *Id.* at 43. When Luster brought out his taser, Milhouse hurriedly placed his hands behind his back for handcuffing. *Id.*

The parties agree that Milhouse was placed in a squad car, taken to the Metra Police Facility, and transferred to the Chicago Police Department for bonding procedures. Defs.' LR 56.1(a)(3) Stmt. ¶ 32. It is also undisputed that Milhouse was charged with misdemeanor Disorderly Conduct and Criminal Trespass to Property and was released from custody within a few hours. *Id.* ¶¶ 30, 33. According to Defendants, Ward had agreed to be the complainant in the criminal proceedings. Luster Dep. at 75, 79. But, again, Ward denies doing so. Ward Dep. at 18–19, 38, 44, 67–68; Pl.'s Ex. 7, Misdemeanor Complaints, ECF No. 135-7.

Milhouse was released from police custody within a few hours. Defs.' LR 56.1(a)(3) Stmt. ¶ 33. When his criminal case was called for trial on October 3, 2016, the judge dismissed the case. *Id.* ¶¶ 34, 35.

Milhouse claims that Luster and Ash targeted him because of his race in violation of his equal protection rights under the Fourteenth Amendment. He also claims that the officers lacked reasonable suspicion to stop him and lacked probable cause to arrest him as the Fourth Amendment requires. Lastly, he claims that Luster and Ash maliciously prosecuted him in violation of Illinois law and that Metra must indemnify them, if they are held liable based upon their actions.

## Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On summary judgment, a "'court may not assess the credibility of witnesses, choose between competing inferences or balance the relative weight of conflicting evidence; it must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party.'" *Orton-Bell v. Indiana*, 759 F.3d 768, 772–73 (7th Cir. 2014) (quoting *Abdullahi v. City of Madison*, 423 F.3d 763, 769 (7th Cir. 2005)).

To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "establish some genuine issue for trial such that a reasonable jury could return a verdict in her favor." *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

## Analysis

Defendants raise numerous grounds as to why summary judgment should be granted in their favor. Defendants first contend that Milhouse has failed to create a genuine issue of material fact as to whether his equal protection rights were violated. Second, they argue that Luster and Ash had reasonable suspicion to stop Milhouse and had sufficient probable cause to arrest and charge Milhouse. In the alternative, they argue that the officers are entitled to qualified immunity.

5

**I.  Equal Protection Claim**

Milhouse claims that Luster and Ash targeted him because he is African-American.  The government may not selectively enforce a law against someone based on his race without violating the Equal Protection Clause.  *See Wayte v. United States*, 470 U.S. 598, 608 (1985); *Esmail v. Macrane*, 53 F.3d 176, 178 (7th Cir. 1995).  Accordingly, "[t]o avoid summary judgment . . . [a nonmovant] need[s] to come forward with evidence that would allow a reasonable jury to infer that the defendants intentionally treated him differently because of his race."  *Lisle v. Welborn*, 933 F.3d 705, No. 18-1595, 2019 WL 3492163, at *10 (7th Cir. Aug. 1, 2019).

In response to Defendants' motion, Milhouse offers two grounds in support of his claim.  First, Milhouse notes that, during his verbal exchange with Ward, Milhouse observed a Caucasian man seated nearby, who had plugged his device plugged into an electrical socket, and that Ward had not asked him to unplug his device.  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 29, ECF No. 135.  This may be, but there is no evidence in the record that this man was still present when Luster and Ash arrived at the food court.  Nor is there any evidence that they were even aware of any other individuals who were using the outlets to charge their devices.

Second, Milhouse asserts that Luster and Ash targeted him because he was African-American and was speaking to a Caucasian woman.  *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 36; Luster Dep. at 34.  But beyond the fact that the officers saw him conversing with a white woman when they approached, Milhouse offers nothing but sheer speculation to support his claim that the officers' actions were racially motivated.  Although the Court must draw all reasonable inferences in Milhouse's favor, "inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion."  *Carmody v. Bd. of Trs. of Univ. of Ill.*, 893 F.3d 397, 401 (7th Cir. 2018) (internal quotations omitted).

Because Milhouse has offered no facts from which a reasonable jury could conclude that Luster and Ash singled him out on account of his race, Defendants' summary judgment motion as to Milhouse's equal protection claim (Count IV) is granted.

## II. Unreasonable Seizure Claims

The Fourth Amendment protects individuals "against unreasonable searches and seizures." U.S. Const. amend. IV. Typically, "seizures are 'reasonable' only when supported by probable cause to believe an individual has committed a crime." *Matz v. Klotka*, 769 F.3d 517, 522 (7th Cir. 2014). One exception to the probable cause requirement arises under *Terry v. Ohio*, 392 U.S. 1, 22 (1968), which "authorizes brief investigatory detentions based on the less demanding standard of reasonable suspicion that criminal activity is afoot." *Matz*, 769 F.3d at 522; *see United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985).

### A. *Terry* Stop

Defendants argue that they had a reasonable suspicion that Milhouse was committing criminal trespass when they detained him.[3] In support, Luster states that, before he and Ash approached Milhouse, Ward had told them that Milhouse had refused to leave upon Ward's request. Luster Dep. at 33, 36; *see* 720 Ill. Comp. Stat. 5/21-3(a)(3) ("A person commits criminal trespass to real property when he . . . remains upon the land of another, after receiving notice from the owner or occupant to depart . . . ."). But Milhouse counters that Ward denies speaking to the officers before they approached Milhouse. *See* Ward Dep. at 18–19, 38, 55–56, 65–68; Cook Dep. at 63. And Cook also denies communicating with the officers about Milhouse. *See* Cook Dep. at 12, 21, 31, 34, 37, 52. What is more, neither security guard spoke to the officers once they approached Milhouse. *See* Cook Dep. at 12, 40, 63; Ward Dep. at 66.

---

[3] Defendants concede that they conducted an initial *Terry* stop of Milhouse. Defs.' Mem. Supp. Summ J. at 7, ECF No. 128.

7

Given this factual dispute, Milhouse has created a triable issue of fact regarding whether the officers had a reasonable suspicion to temporarily detain Milhouse for criminal trespass. Accordingly, Defendants' summary judgment motion as to Milhouse's *Terry* stop claim (Count I) is denied.

B.  **False Arrest**

Next, Defendants argue that summary judgment must be granted as to Milhouse's false arrest claim because the officers had probable cause to arrest Milhouse. "Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for wrongful arrest." *Mustafa v. City of Chi.*, 442 F.3d 544, 547 (7th Cir. 2006). "Where an individual is arrested on multiple charges, a finding of probable cause for any one of the charges is sufficient to negate a § 1983 claim for false arrest." *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1102 (S.D. Ind. 2008) (citing *Ochana v. Flores*, 347 F.3d 266, 271 (7th Cir. 2003)).

Police officers have "probable cause to arrest when the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense." *Sheik-Abdi v. McClellan*, 37 F.3d 1240, 1246 (7th Cir. 1994). "Moreover, the court's inquiry is limited to what the officer knew at the time of the arrest and not what has been gained from hindsight." *Harney v. City of Chi.*, 702 F.3d 916, 922 (7th Cir. 2012) (citing *Mucha v. Vill. of Oak Brook*, 650 F.3d 1053, 1057 (7th Cir. 2011)). "In deciding this question of law as part of a motion for summary judgment, however, [the court] must give the non-moving party the benefit of conflicts in the evidence about what the officers actually knew at the time." *Williams v. City of Chi.*, 733 F.3d 749, 756 (7th Cir. 2013).

8

Defendants argue that they had probable cause to arrest Milhouse for criminal trespass. As noted, in Illinois, "[a] person commits criminal trespass to real property when he . . . remains upon the land of another, after receiving notice from the owner or occupant to depart . . . ." 720 Ill. Comp. Stat. 5/21-3(a)(3). But, as discussed above, the parties dispute whether Luster and Ash were aware that Milhouse had previously refused to leave the building when Ward asked him to do so. Accordingly, whether the officers reasonably believed that Milhouse had committed criminal trespass is an issue for trial.

Nonetheless, the officers argue that, whatever communications they may or may not have had with Ward about Milhouse, they had probable cause to arrest Milhouse for trespass, because he refused *their* directive to leave. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 25; Pl.'s Dep. at 99. In addition, based on this refusal, the officers contend that they had probable cause to arrest Milhouse for obstructing a peace officer (although they did not arrest him for that crime). *See* 720 Ill. Comp. Stat. 5/31-1(a) ("A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer . . . of any authorized act within his or her official capacity commits a Class A misdemeanor."); *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 682 (7th Cir. 2007) ("[P]robable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause."). And, finally, the officers argue that they had probable cause to arrest Milhouse for disorderly conduct. *See* 720 Ill. Comp. Stat. 5/26-1(a)(1) ("A person commits disorderly conduct when he or she knowingly . . . [d]oes any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace . . . ."). Bu these arguments all are premised upon Luster and Ash's account of the incident; the facts of what took place, however, are hotly disputed.

On the one hand, the officers state that they initially asked Milhouse to move to the Metra-installed charging stations in the waiting area on the train platform, but that he refused. Luster Dep. at 39. Then, after prolonged verbal sparring, Ash told Milhouse to leave or else he would go to jail, but Milhouse still refused. *Id.* at 40–41. Only then did the officers arrest Milhouse. *Id.* at 41. By contrast, Milhouse says that only a few seconds passed between when the officers first approached him and when they handcuffed him. Pl.'s Dep. at 99–100, 108–11. In those few seconds, the officers directed Milhouse to unplug and leave, and, as Milhouse calmly informed the officers that he had a train ticket and asked them why he had to leave, the officers arrested him. *Id.* at 99–100, 102, 109; *see* Ward Dep. at 86 ("No one expected him to be arrested.").

Next, the officers assert that Milhouse directed profanity at them and that Ward also had told them that Milhouse had sworn at him and threatened to kick his ass. Ward Dep. at 62; Cook Dep. at 37; Luster Dep. at 41. But Milhouse denies doing any of those things, stating that he acted in a cool, calm, and collected manner during his encounters with the security guards and officers. Pl.'s Dep. at 85, 109. And Ward testified that he did not speak to the officers before, during, or after Milhouse's arrest. Ward Dep. at 17, 37–38, 41, 43, 66; *see* Luster Dep. at 47.

Viewing all disputed facts in Milhouse's favor, as the Court must on summary judgment, a reasonable jury could find that the officers lacked probable cause to arrest Milhouse for trespassing, obstructing a peace officer, or disorderly conduct. *Cf. D.C. v. Little*, 339 U.S. 1, 6 (1950) (mere criticism of an officer in the performance of his duties is not usually held to be unlawful interference); *People v. Baskerville*, 963 N.E.2d 898, 904 (Ill. 2012) (stating that the Illinois Supreme Court has shown concern "that criminalizing verbal conduct may run afoul of free speech and other constitutionally protected conduct"). Because the resolution of Milhouse's false arrest claim rests on genuine issues of material fact, namely, whose account of the

circumstances of the arrest ought to be believed, Defendants are not entitled to judgment as a matter of law, and Defendants' summary judgment motion as to Milhouse's false arrest claim (Count II) is denied.

### C. Qualified Immunity

Luster and Ash also invoke the qualified immunity doctrine. "Qualified immunity protects officers performing discretionary functions from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights that a reasonable person would know about." *Burritt v. Ditlefsen*, 807 F.3d 239, 249 (7th Cir. 2015) (internal quotation marks omitted). "[T]wo questions are pertinent to the defense of qualified immunity: whether the facts alleged show that the state actor violated a constitutional right, and whether that right was clearly established." *Hanes v. Zurick*, 578 F.3d 491, 493 (7th Cir. 2009) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). When a defendant raises qualified immunity as a defense, the plaintiff has the burden of establishing that the defense is inapplicable. *Mustafa*, 442 F.3d at 548.

Milhouse had a clearly established right to be free from a *Terry* stop unless the officers had reasonable suspicion that he committed a crime. *See Jewett v. Anders*, 521 F.3d 818, 823 (7th Cir. 2008). He also had a clearly established right to be free from an arrest unsupported by probable cause. *See Burritt*, 807 F.3d at 250. Whether Luster and Ash had reasonable suspicion to detain Milhouse and whether they had probable cause to arrest him depend on disputed issues of fact. Accordingly, the Court denies summary judgment on this basis.

## III. State Law Malicious Prosecution Claim (Count V)

In addition to his federal claims, Milhouse has sued Defendants for malicious prosecution under Illinois law. "In order to prevail on a malicious prosecution claim, a plaintiff must establish '(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.'" *Holland v. City of Chi.*, 643 F.3d 248, 254 (7th Cir. 2011) (quoting *Swick v. Liautaud*, 662 N.E.2d 1238, 1242 (Ill. 1996)). If any of the elements are not satisfied, the plaintiff cannot recover. *Swick*, 662 N.E.2d 1238 at 1242. "For purposes of a malicious prosecution claim, the pertinent time for making the probable cause determination is the time when the charging document is filed, rather than the time of the arrest." *Holland*, 643 F.3d at 254.

Defendants focus solely on the third element and argue that they had probable cause to charge Milhouse with criminal trespass and disorderly conduct.[4] But the officers do not contend that they obtained any additional information between the time Milhouse was arrested and the time the charging documents were filed. *See* Defs.' LR 56.1(a)(3) Stmt. ¶ 33; Luster Dep. at 47; Misdemeanor Complaints (dated April 24, 2016). Thus, the only reasonable conclusion is that their decision to charge Milhouse was based on the very same facts that supported his arrest. And, as noted, there are numerous disputed facts as to what exactly took place in the food court.[5] As

---

[4] Defendants do not contest the other elements of malicious prosecution. Therefore, for summary judgment purposes, they have waived any argument regarding these elements. *See Baker v. Ghidotti*, No. 11 C 4197, 2014 WL 1289566, at *7 (N.D. Ill. Mar. 28, 2014).

[5] Defendants' reliance on *Brock v. City of Chicago*, No. 17 C 3393, 2018 WL 3574752, at *6 (N.D. Ill. July 25, 2018), misplaced because, in contrast to this case, the *Brock* court held that no reasonable jury could find the arrest lacked probable cause. In addition, *Brock*, *Colbert v. City of Chicago*, 851 F.3d 649, 655 (7th Cir. 2017), and *Starks v. City of Waukegan*, 123 F. Supp. 3d 1036, 1061 (N.D. Ill. 2015), are inapposite because there is no evidence of an intervening indictment here.

such, the Court denies Defendants' summary judgment motion as to Milhouse's malicious prosecution claim, as well as Milhouse's state-law indemnification claim.[6]

## Conclusion

For the reasons provided in this Memorandum Opinion and Order, Defendants' motion for summary judgment is granted as to Milhouse's equal protection claim (Count IV) and is denied in all other respects. The Court strikes as moot Plaintiff's motion to strike Defendant Ash's affidavit.. Because Milhouse has withdrawn Count III, only Counts I, II, V, and VI remain for trial. At the status hearing set for 10/1/19 at 9:00 a.m., the parties shall be prepared to set dates for trial, the final pretrial conference, and the filing of the final pretrial order, motions in limine, and jury instructions.

**IT IS SO ORDERED.**   ENTERED: 9/20/19

_____
**JOHN Z. LEE**
**United States District Judge**

---

[6] Milhouse has filed a separate motion to strike an affidavit submitted by Ash to support Defendants' summary judgment motion. [137] But Ash's affidavit has no bearing on the Court's ruling, because with or without it, there remain disputed issues of genuine fact as to (1) what was communicated by Ward to the officers prior to their encounter with Milhouse and (2) what took place between the officers and Milhouse in the food court. Accordingly, the motion is stricken as moot.